The next case on the call of the docket is agenda number three, case number 1-2-5-7-2-2, People, the State of Illinois v. Andrew Salamon, Linda-Marie Olaf-Altoff. You may proceed. Good morning, Your Honors. May it please the Court, my name is Linda Oltoff on behalf of Andrew Salamon. The issue before this Court today is whether Andrew Salamon's statement, taken 24 hours after he was taken into custody, was rendered involuntary, where the police, without really any real explanation, denied his repeated request for a phone call in order to obtain a lawyer. Now, the facts, as elicited at the suppression hearing, are largely undisputed. We know that Mr. Salamon was arrested when he was leaving from work, taken immediately to the police station. Immediately, he said he wanted a phone call in order to call an attorney. He repeatedly asked for that, and the police repeatedly told him he would just have to wait. The police offered no explanation for this refusal to grant a phone call, other than to say this is our procedure to wait until he is booked or processed. What the police did here was they combined two tactics, which individually or on their own are potentially coercive, and they created an even more effective method to extract a statement from an otherwise unwilling suspect. They took a lengthy they utilized a lengthy detention for 24 hours. And we know that 24 hours is a long time for anybody in any situation. But this was just not a situation of inconvenience. He was taken from the street and had his liberty restrained. So in the context of this case, where he was held in isolation from the outside world without access to a phone call, without a right, being able to access his attorney, an attorney, we have an extremely effective coercive situation. The police already have a very We know interrogations are an inherently coercive situation. But it becomes even more, the power imbalance becomes even more heightened here, where the one tool that the Constitution guarantees a suspect is that they have a right to counsel, to help them navigate the circumstances of an interrogation. That is the one tool that is to lower the temperature or act as a device. But in order to avail himself of that tool, Andrew Solomon was at the mercy of the very people whose sole objective was to get a statement out of him and to garner incriminating evidence. Counsel, if we agree with your position, would we be required to set a time limit? Well, the Onoi legislature, since the filing of these briefs, has clarified the statute and says a reasonable time is 3 hours. This Court doesn't have to set a time limit. I think it is part of a totality test. 24 hours, though, far exceeds any reasonable time and far exceeds 3 hours. And I think, yeah, there does not have to be a certain time limit. But when it becomes unreasonable, where we have to set a time limit, where a defendant says, I wouldn't give a statement, except for I'm sitting here, with no access to anybody from the outside world, and the power imbalance is so exponentially heightened. What is the parameters about the 3-hour rule that you mentioned? I'm sorry, I? You said 3 hours? Yeah. What's the parameters of that? If they don't discover anything, they release somebody? Or if the investigation is stopped or paused? Well, they need to give a phone call in that 3 hours. So within that 3 hours, they are required to have the client or the suspect is entitled to a phone call within that 3 hours. And certainly, once you pass that 3 hours, the presumption can be that the statement is becoming involuntary, that the context of the statement and the context of the interrogation is becoming increasingly coercive. You would agree there are situations where the police would be justified in denying someone access to the outside world. In this case, there's some evidence that this Jackson individual was still out there, and police were apparently trying to round him up. So, I mean, there are some situations where that's the case. Or are you saying it's a 3-hour rule no matter what, no matter what the investigation? There may be some situations where there are extreme circumstances where there's a reason why they couldn't give the suspect his phone call within 3 hours or within a reasonable amount of time. But here, the offense had occurred 2 years prior. There's no indication that Mr. Salomon had any contact with Jackson. And even if they were worried that he might tip somebody off or talk to somebody that the police didn't want him to talk to, that has nothing to do with his access to an attorney. And there's no reason to believe that if he was going to tip somebody off when he first came into custody, why wouldn't he tip them off 24 hours later? So I don't think in this, that's a very speculative thought, that maybe that was why the police didn't give him the phone call. And, indeed, if there was such a reason such as that, the police had every opportunity at the suppression hearing to explain why they didn't want to give him a phone call or why they couldn't. They were able to give him food. They did all the technical things. They gave him food. They gave him water. They took him to the restroom. So then what was so hard about giving him a phone call? Why did they have to wait before the booking process to begin to give him a phone call? Why couldn't they just walk him out? They were able to do everything else. They gave no reason as to why they could not give him a phone call in order to contact a lawyer. Counsel, the defendant was, you said he was in isolation for 24 hours. Any other circumstances regarding how he was being held that is relevant? Well, we know that he was in a small interrogation room, windowless interrogation room, 6 by 8, 6 by 10, handcuffed to the wall. At least some of the time the officer at the suppression hearing said he was handcuffed. Some of the time at trial they said it was the entire time he was in the room he was handcuffed to the wall. So those all add to the coerce of nature and the feeling of helplessness that will ensue when an individual is not given any access to anybody from the outside world. And also, he was taken from while he was on his way home from work. Nobody knew, presumably, it wasn't as if he was taken from his home where a family member could call a lawyer or they all knew where he was. He just disappeared into police custody, which further heightens the isolation and the feeling of hopelessness. And, wow, I'm dependent on these officers to help me with anything. And they're my adversary in this situation. Counsel, are you asking us to assume that your client's will was overboard? Because that was not raised below. That was not raised in the trial court. And there's some argument that the record was not fully developed by either the defense or the State on the issue of voluntariness. The record was, to determine whether his will was overboard, the record was adequately developed and factually developed. All the facts that are relevant to that finding are on the record, and all the facts that we are relying on here. Isn't there one fact that's missing, and that is the defendant testifying that the reason I kicked on the door and said I want to talk to you is because I couldn't take it anymore. Like, I was coerced, in essence. As opposed to, like, I was sitting here for 24 hours, and my conscience got the best of me, and I therefore wish to confess. I think he didn't come clearly out and say, this is why I knocked on the door. But we know he was there for 24 hours, and if his conscience is going to get the best of him, he wouldn't need to sit there for 24 hours in a locked room in a very uncomfortable situation before he decides to talk. And even when we look at the statement that he gave, throughout the statement, within a couple of questions, when the police start talking to him, now can I have a phone call? Now can I talk? So even the circumstances of the actual interrogation indicate that this was why he was talking. He was waiting for that statement. And below, you know, at the trial court, when they talked about his reinitiation of Miranda became meaningless, the reinitiation with the police was meaningless, the Miranda warnings were meaningless, that all goes to whether he was compelled to give a statement. And the record is fully developed, the facts are fully developed, and that was really the issue below. And even the State's attorney below argued we have met our burden to show that the statement was voluntary. Sotomayor Is there a difference between telling somebody you have to wait for a phone call and then, or denying, or just denying it? O'Connell As opposed to explicitly denying it? Sotomayor Right. Uh-huh. O'Connell No. No. He asked for a phone call, and they told him he would have to wait. Absence of giving him his request, which he's told he has a right to, and there are signs in the police station, you have a right to a phone call, and he's given Miranda warnings telling he can get counsel. And when they just don't give it to him, the effect is the same, that he knew that he was not going to get a phone call. How long does he need to wait? Is it, you know, 16 hours, 24 hours, 48 hours? You start to think, how long am I going to be here? They keep telling me I don't get a phone call. And the State, in its brief, and the appellate court below, seemed to think or suggest that it was a, that somehow the police conduct here was cured by the fact that they gave Miranda warnings and that they ceased questioning. But, in fact, the, that's not enough. It's not enough that they just cease questioning, and it's not enough that they give Miranda warnings. There's a reason that Illinois has created this statute to allow suspects to have a phone call. And instead, they use Miranda, and they give him the Miranda warnings, and they tell him you have a right to a lawyer. And they dangle that in front of him, but keep it out of his reach. And that is a coercive tactic. Does it make any difference, the nature of the charge, in our analysis? No. So the fact this is a murder shouldn't make any difference? No. This is a burglary or something else? No. A murder suspect, a burglar, they all have the same right, and they are all presumed innocent yet at this point. They have not been charged, and they have this right. So, yes, and it's not enough that they cease questioning. And one other thing we can look at is not only did they violate the statute, but they violated the spirit of how this Court has construed the due process clause of the Illinois Constitution. And although McCauley is a different set of circumstances and a different issue, there are some very important, I think, key takeaways from that. In there, they held that the preference is, in Illinois, for a suspect to have access to counsel. They also said it is not enough to just comply with Miranda. It is not just enough to tell him that he has a right to counsel. McCauley said there cannot be a deliberate denial of access to counsel. And here, maybe the police didn't affirmatively interfere with the lawyer who was present at the station, but there was a deliberate denial of an access to counsel. There was no ability for him to give his right to counsel. So we've heard that the police had a policy of not allowing a phone call until after the statute. Who testified to that? What information do we have about it? What do we mean by booking? What can you tell us about that statement? What we have in the record is that it was the police officer, Detective Thompson, I believe it was, testified that it is our policy that we don't let a phone – let a suspect make a phone call until he is booked and processed. So to what extent that means fingerprinting, being put in the system? It was – After charging, after the police officer makes a determination to charge? The record's not clear – Or the state's attorney makes a decision to charge? The record doesn't clearly – nobody in the record really clearly defined booking. I don't think booking is dependent on charging. So, yeah. Okay. What I would – what we would submit is that the police here effectuated a tool in which they extracted a statement that was involuntary. Because this Court has given such a preference and such strong respect to the ability of a suspect to have counsel, we cannot condone the police behavior, we cannot condone the conduct that occurred here. And therefore, it should find that his statement was involuntary. There's been no legislative remedy for this kind of 103 issue? The legislature hasn't done something to say something about it? About a remedy? An explicit remedy? No, it hasn't created an explicit remedy. There's no prophylactic type remedy. But how this Court and how Illinois courts have looked at it is a factor into voluntariness. When you keep a suspect beyond a reasonable amount of time, that is a – without giving him a phone call, that should be considered in determining whether his statement is voluntary. And the issue with regard to – even if the matter shouldn't have been introduced in evidence, there's still plenty of evidence dealing with other testimony by other witnesses and other evidence dealing with cell phone records and the autopsy about how the person died. I don't think there is enough evidence here to say that the error here was harmless. Keep in mind that confessions have been considered the most powerful piece of evidence against an individual. And it is the State's burden to prove beyond a reasonable doubt, it has to be harmless and that's the State's burden here. What we have is you have a purported statement from a friend or an acquaintance who said that Andrew talked to me. But he had no personal knowledge of the crime. You have no eyewitnesses, no – nobody with personal knowledge, no physical evidence against him, no weapons were found, no fingerprints. And these are all questions, then, for the jury. When we don't have the statement, the jury might evaluate the remaining evidence very differently than it did without his statement. And so the jury cannot be deprived of considering the evidence in light of what should be properly admitted. The closing argument in this case, the defense counsel admitted that the defendant agreed to participate in the burglary that eventually led to the death, right? That he admitted to the burglary, yes. Right. But again, closing arguments are not evidence. And once the court admitted the statement, counsel had to argue what he was stuck with and what he was left with. And so, yes, there's no question that his statement was involuntary. There's no other reason why he would wait for 24 hours and speak finally 24 hours later. And where the police acted in a way to elicit that statement without giving him access to a phone call, that statement must be found involuntary. Thank you. Thank you, Mr. Liptoff. Mr. Jason Foster-Kriegel for the appellate. Good morning, Your Honors. Counsel. May it please the Court. This Court — Oh, sorry. Assistant Attorney General Jason Kriegel for the people. This Court can affirm defendant's conviction on any one of three separate grounds. First, the involuntary confession claim is not preserved because it was not presented to the circuit court. Second, even based on the record that's before this Court, defendant's confession was not involuntary when considering the totality of the circumstances. And third, even assuming an error, the admission of the confession was harmless in light of the other strong evidence, particularly defendant's second unchallenged confession to his longtime friend. Turning first to the preservation issue, I think what's most telling about defendant's warning and the reply brief is that he cannot point to any place in the record in which he asked the circuit court to find his confession involuntary, to find that the detectives coerced him, or to consider the totality of the circumstances in this case. And, in fact, we have more than the defendant's silence. We have his acquiescence when the prosecutor twice objected and characterized defendant's motion saying, Judge, this is not a case about coercion. This is just about reinitiation in Edwards v. Arizona. And defendant, in his reply brief, attempts to draw a distinction that he didn't concede all coercion. He only conceded physical coercion. But I think that's just not borne out by the record, because if you look at the place in the transcript on pages KK 12 through 13 where the prosecutor raises his first objection, the testimony at that point in time is that defendant has been arrested, he's put in the car with the two detectives, and he alleges that the detectives say to him something to the effect of, we can do this the easy way or the hard way. Now, that is not an allegation of torture. It's an allegation of a threat, of a psychological coercion. And if the judge had credited that statement, it could go toward that sort of a claim. But defendant said, no, I'm not offering that testimony as coercion. And so the circuit court quite properly understood that that was not the issue being raised below. And so when you look at the court looks at the suppression motion itself and the arguments that were made at the suppression hearing, there were two narrower claims that defendant did pursue. One was this Edwards violation. He had alleged that the police were the ones that actually reinitiated the interrogation. He's abandoned that claim on appeal. He now concedes that the circuit court correctly found that it was defendant and not the detectives who reinitiated the interrogation. And the second claim was a statutory claim under 103-3A that a phone call was not provided within a reasonable amount of time, and as defendant now concedes, there is no suppression remedy in the statute. And so he was not entitled to have his confession suppressed, even if the court had found a statutory violation. And just to clarify one point, counsel mentioned the recent legislation that was passed in the General Assembly, which did address this issue and changed the statute so that now it's required that a suspect is provided a phone call within three hours. That obviously does not apply in this case, but even going forward, the legislature has not provided a suppression remedy as part of that statute. So clearly, what follows, what follows is, you know, as this Court has held in, in People v. Ramey, is you can't focus in a nonvoluntary confession claim, you don't focus simply on one factor. You have to look at the totality of the circumstances. So that leads me into our second argument, which is that on this record, defendant's will was not overborne. The question is, is there coercive, improper police activity that overcomes defendant's will and causes him to confess? And I think that's what we're getting at. I suppose that's where we are. May I ask you something about the statute? The statute does talk, the statute we're looking at does talk about a reasonable time. A phone call must be given, be allowed within a reasonable time. We have testimony here that the officer testified that normally defendants are not allowed to have that phone call until after they've been booked.  And secondly, is that reasonable to have a policy that only when there has been enough evidence developed that defendant is booked will he be allowed to have a phone call? Sure. Well, so I, I agree with counsel that there's not a lot in this record about exactly what happened here. And, and we certainly can see that in the mine run case, 23 hours is, is longer than should be provide, provided for a, for a phone call. But, but this is not a mine run case. You know, this was an ongoing murder investigation where the, the principle in the murder was still at large. And, and on this record, it's very hard to say whether or not this amount of time was reasonable. We don't know exactly what booking means in this context. There was a common. It sounds like from the testimony, and again, we just have a snippet, but this is a policy of the police. They would not allow a phone call until after booking. And I think I understand that booking means after charges have been brought. Is it, so if that's correct, is that policy conformed to the statute? Well, I, the, there wasn't a lot of, there wasn't testimony about what booking means in this context. It seemed from what the prosecutor said in his argument that the, the state's attorney was going to come and decide whether charges were be, would be brought and then defendant would be provided a phone call at that time. So only after felony review approved the charges would he be allowed a phone call? Again, that, that's what it's, what I took from the, the prosecutor's argument, but there wasn't even testimony on that point. So I think it's very hard to say from this record. And, and again, the, the State never had an incentive to develop the record on this point because defendant had not raised an involuntary conviction. The defendant raised the 103.3 violation. So you, the State certainly had the, a reason to develop the record on whether this was reasonable or unreasonable. Well, that's true, Justice Berg, that he did raise the statutory question. But as defendant now concedes, there is no, there is no suppression remedy under the statute. So even if, even if defendant had, had established a statutory violation, he would not be entitled to suppression. So there just simply wasn't an incentive to expand the record on, on this point. But I would say even assuming that there was a statutory violation in this case, even, even assuming that he should have been provided a phone call at some earlier point in time, it's important, as this Court held in Ramey, to look not at one factor as dispositive, but to look at the totality of the circumstances. And again, this is, as Ramey held, it's a factual determination whether defendant's will has been overborne, given the totality of the circumstances. And in this case, I think it's important to look at all of those circumstances. So just briefly, in terms of the characteristics of this defendant, it's undisputed he is an adult. There were no physical or mental vulnerabilities. The circuit court found, and it's undisputed now, that he understood his Miranda rights. And then looking at the, the particular treatment of, of this defendant while in custody, it's undisputed that police complied with Miranda, so he was arrested. He was brought to the police station, and he was immediately read the Miranda rights. He asked to speak to an attorney, and police immediately ceased questioning as they are required to do under Miranda. And at that point, from the police perspective, they were done with this defendant. They were continuing their investigation. But there was nothing more for them to do until he was booked and then brought to court. And, of course, there are, there are clear constitutional guidelines about how that's supposed to proceed under Gerstein. He's entitled to a prompt probable cause hearing. Presumptively, that should be within 48 hours. There's never been any allegation that defendant was held improperly beyond those time limits. And so, so there's no inference that, that, that detention on its own was improper. During this time, he was given food and water. He was taken to the bathroom several, several times. He was given contact lens solution. There was testimony at the trial from Detective Gillespie that he slept. There was a bench where he could sleep. And so, and then defendant also counsel stated many times in her argument that he repeatedly asked for a phone call. But respectfully, that was not, that was his testimony. The Detective Thompson testified at the suppression hearing that he did not remember defendant ever asking for a phone call. And because this, because the circuit court's factual determination is reviewed for the manifest way to the evidence, the record should be viewed in the light most favorable to the state here. And the circuit court could have credited the detective's testimony over defendant's. Counsel, whenever defendant asked to speak to law enforcement again, was he given his Miranda rights? Yes, Your Honor. He, he banged on the door. Another detective came to see what he wanted. He asked at that point to speak to Detectives Thompson and Gillespie, who were the two detectives on this case. They came back in the room. At that point, he said, I want to talk about the case more. And they said, well, wait, we have to give you, you've asked for an attorney. We have to give you your Miranda rights again. And they explained his rights. And he agreed, he agreed to talk at that time. And by the way, the circuit court saw all of this happening. It viewed the video recording of this reinitiation, and it found that it was not coercive. And defendant has not provided this court with that video, even though he is the appellant and it's his obligation to do so. So this court cannot overcome the circuit court's factual determination. Defendant also mentioned the issue of the handcuffs. The only testimony at the suppression hearing was that some of the time defendant was in handcuffs. Now, at trial, detective, defendant, defense counsel actually asked more questions about the handcuffs at the trial. And Detective Gillespie said that for defendant's safety, when the officers were not there, for defendant's safety and for the officer's safety, he had a handcuff. It was next to the bench where he was so he could sleep. And that it came off when he was given food and water, when he went to the bathroom and so forth. And so it's not true that the handcuffs were on the entire time. And then, and I think also most critically, during this period of time, there was absolutely no interrogation. Detective Thompson testified that no questions were asked about this case. And that's important because interrogation is one of the constitutional touchstones in the Miranda inquiry. So the whole purpose of Miranda is that detention and interrogation are inherently coercive. And so police are required to explain to a defendant that they have these rights. And it is undisputed that from the time that defendant invoked his right to counsel to the time that he reinitiated, no questions were asked of him. So there were no threats. There was no deceit. There was no, of course, there's been a concession that there's no physical coercion of any kind. So when you look at the totality of the circumstances here, the circuit court's finding that defendant understood his Miranda rights and agreed to waive them was not against the manifest weight of the evidence. And Justice Burke made a good point, which was that defendant testified at the suppression hearing. And if he had felt any fear, if he had felt, you know, he's asking this Court now to draw the inference that because he was not given a phone call, he felt that he would never be set free if he or never be given access to the outside world if he did not confess, but he didn't testify to that effect. And so there was no reason for the circuit court to draw that inference. The people have cited in our brief at least three cases which involved voluntary confessions given after prolonged overnight detentions where the defendant did not have access to counsel. That's the Willis case, Chapman, and In re Geo. And defendant simply cannot persuasively distinguish these cases from that one. The only distinction that he points to is that this defendant asked for an attorney. But I think as I've argued, that actually cuts against him because the fact that he asked for an attorney shows both that he understood that he had the right to speak to an attorney before being questioned, and it shows, and it resulted in the fact that he was not subject to any interrogation. So the defendants in Willis, Chapman, and in re Geo were interrogated over several hours overnight and then eventually confessed, and that did not happen in this case. So then on our third argument, the harmlessness. As counsel argued, confession is very powerful evidence, and in this case there were two confessions. So even assuming that it had been error to suppress defendant's recorded confession to the police, this Court can be confident that it was harmless beyond a reasonable doubt because the jury also heard a second confession that is unchallenged here from defendant's friend, Polo Rotama, who testified that he had known defendant for 15 years. Defendant comes to him and tells him, I'm afraid, I'm going to be, I'm going to go down for this murder, and he proceeds to tell Rotama key facts that are thoroughly corroborated by the other evidence in this case. So Rotama knew that Jackson had a grudge against the owner of this bar. He knew that Jackson beat the owner to death with a pipe. He knew that defendant punched Gonzales in the face. And this evidence lined up perfectly with the testimony from Santos about the pipe, about the plot, with the testimony from Calvino about the fight at the bar, with the forensic evidence that showed both the, that Gonzales was killed by a narrow, blunt object like a pipe, and that there was a separate, less severe injury to the head that was consistent with this, with the punch. So this was very powerful evidence. And there simply was no innocent explanation that on this record or that defendant has offered since that the, that could have raised a reasonable doubt in the jury's mind about why would Rotama make this up? How could he know these details? There's simply, there's simply no innocent explanation for any of that. I'd be happy to answer the Court's questions, but we would ask that this Court affirm the defendant's conviction. Thank you. Thank you, Mr. Kriegel. Ms. Zolotoff. Initially, as to counsel's statements as to whether this was waived and what not fully presented in the record, counsel below did not acquiesce in those instances to which he refers. The one he referred to was, you know, when the police first arrested him and took him in, they had their, I can't quite remember, their guns drawn or something, and the State's attorney below objected. And defense counsel said, well, I'm not eliciting this about coercion, but it's important to understand the circumstances of the arrest. Same thing when they elicited testimony about handcuffs. Counsel said, it's important to know that he's being held in a locked room for 24 hours while handcuffed to a wall. These points are not required and we are not relying on those, and neither was trial counsel below for the basis of the involuntariness of the statement. But it was relevant, and the Court overruled the State's attorney's objections. It was relevant to show the circumstances of the arrest and the custody. The reason for the waiver principles and that we were met here, the record was factually developed. We are not relying on anything that wasn't put in the record. The State had every opportunity to respond to these questions of why the police did what they did. And it's clear that they understood this to be a voluntariness issue below. The State's attorney asked the police, did you give him food? Did you give him water? Did you help him with his contacts? All questions that go to voluntariness. And finally, the Cook County State's attorney who litigated this at the appellate level had no complaints about that this wasn't properly litigated below. It's only now that this opposing counsel brings this up. And this Court, as we know, waiver is a limitation, even if there is any waiver here, it's a limitation on the party and not on the courts. The Court must address this issue here because this cannot be normal police procedure. You cannot wait until after the charges are brought to give him a phone call because at that point it's too late. And indeed, in looking at the totality of the circumstances, the State now looks at some of the characteristics which they complained were not fully litigated below. And we look at the, you can't look at the defendant's age, his mental and physical abilities. Well, I would say in a case such as this one, a person's physical and mental capabilities are not that relevant when you are trying to get your attorney, you are trying to get an attorney. So no matter how smart you are, how strong you are, how experienced you are, you know you have a right to an attorney and you have no way to get that. And this is the most important tool that a person has, that a citizen has, to kind of negate the coerciveness of this. And so it's not just a minor distinction that in this case the defendant asked for an attorney, whereas in those other cases he never asked for one. Here he asked for an attorney and he was, yes, told that he had a right to one, but the police, while they technically complied with Miranda and they ceased questioning, what they did was they turned this into a tool. They dangled his Miranda rights in front of him. Yes, you have a right to counsel, but you need us to give it to you and we're going to keep it out of your reach. And so he's there for 24 hours. And a statement cannot be considered involuntary in that situation. No, the police did not do everything they were required to do. They are required by statute to give a suspect a phone call within a reasonable amount of time. And they did not do that here. And I think you can also say that they were required under the Due Process Clause, as it is understood in Illinois, to give him a phone call. As the Court noted in McCulley, the day is long past where an attorney has to sit at the jailhouse door and shout advice to his client. Here the attorney could not even get to the jailhouse door. It was interfered with at an even earlier level. So for these reasons, if there are no other questions, we would maintain that counsel's statement was involuntary. And because it is such a powerful piece of evidence, it cannot be considered harmless, and the State did not meet its burden of showing that it was harmless beyond a reasonable doubt. Thank you, Ms. Olichok. Case number 12572, Peeple v. Andrew Salomon, known as Agenda Number 3, will be taken under assessment. Thank you, Ms. Olichok, for your argument this morning, and Mr. Preeble for your argument.